UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BARBARA H. LINDSAY,              )
                                 )
            Plaintiff,           )
                                 )      Case No. 4:08CV1321 CDP
vs.                              )
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security, )
                                 )
            Defendant.           )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Barbara H. Lindsay benefits under Title II

of the Social Security Act, 42 U.S.C. § 401, *et seq*.  In 2006, Lindsay applied for

benefits for a period from 1977 to 1982.  Lindsay claims that she is currently

disabled by an unidentified disorder causing extreme muscle rigidity and fatigue

and that this disorder disabled her before 1982.  The ALJ, however, found that

Lindsay did not show that this condition disabled her during the relevant time

period.  Because I find that the Administrative Law Judge's opinion is supported

by substantial evidence, I will affirm the decision.

PROCEDURAL HISTORY

On March 31, 2005, Lindsay filed an application for disability benefits

pursuant to Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, alleging her disability began on July 30, 1977. Lindsay claimed disability based on "metabolic myopathy of unknown origin, muscle rigidity, chronic fatigue, chronic pain, and thyroid problems." Lindsay's insured status expired on June 30, 1982, therefore, the ALJ's task was not to review the record to determine whether Lindsay is disabled now, but whether she was disabled between July 30, 1977 and June 30, 1982.

Administrative Law Judge Pappenfus denied Lindsay's claim on June 25, 2007, after it was initially denied by the agency on June 16, 2005. The ALJ found that the record did not support Lindsay's claim. In response, Lindsay requested review and submitted additional evidence to the Appeals Council. The Appeals Council denied review of the ALJ's determination on June 27, 2008. Therefore, the decision of the ALJ stands as the final decision of the Commissioner subject to review under 42 U.S.C. § 405(g). Plaintiff filed this appeal on December 9, 2008.

EVIDENCE BEFORE THE ADMINISTRATIVE LAW JUDGE

Lindsay requested a hearing on her claim, but was unable to attend. The transcript of a pre-hearing conference attended by her attorney is included in the record. Lindsay testified by deposition. In her deposition, taken on March 14, 2007, Lindsay stated that her condition had begun during puberty, that she could

not ride bikes with her friends, and that she could not run a mile in gym class as an adolescent. She claimed that her condition deteriorated over time, that her back would stiffen and ache, that she became weak, and that her feet, neck, and shoulders would hurt. Lindsay stated that she currently cannot turn her head, walk two and a half feet, or lift four ounces.

The record also included all of the forms filed with the Social Security Administration, including Lindsay's application for benefits, a disability report, and a case analysis. The Commissioner's investigation included a statement from Lindsay's son, Douglas Lindsay, corroborating her disability. The record contained Lindsay's medical records, and three medical opinions from doctors Hellwig, Padda, and Boedefeld. Lindsay also submitted an opinion from a Dr. Golding to the Appeals Council. Dr. Golding's opinion was not in the record before the ALJ.

MEDICAL RECORDS

The record includes Lindsay's surviving medical records from 1965 to 2008. The ALJ stated that she considered all of Lindsay's medical records and she specifically addressed Lindsay's medical records until 2000.

**1.      Period Prior to 1982**

Lindsay claims disability based on chronic fatigue, muscle rigidity and

undetermined metabolic myopathy and thyroid disorders.  The medical records from the period before 1982 show intermittent treatment for allergies, sore throats, a deviated septum, ear aches, a hysterectomy, backaches and headaches.  Her treating physicians during the relevant period were allergists, ear, nose, and throat specialists, and an Ob/Gyn.  One record in 1981 notes that she had visited a neurologist for headaches, however, no records from the visit were included in the record.  None of her records before March of 1982 mention the hallmarks of her current disability –  an inability to walk more than a few feet or relax her muscles after contraction and severe fatigue.

Lindsay was born in 1950.  Dr. Mahe treated Lindsay for hay fever in 1964 and administered a "desensitization program - ragweed" from July 1, 1965 through January 20, 1967.  Dr. Mahe also treated Lindsay for recurring throat problems, including sore throats, strep, enlarged tonsils, and tonsillitis.  On March 19, 1973, Lindsay reported painful bumps on her shins that had persisted for several weeks.  By the end of the month, no new bumps were detected and Lindsay did not report any joint aches.  In a notation under the heading "Health History," Dr. Mahe wrote "[19]73 - Fybromyalgia" without explanation.

She was later treated for allergies on March 19, 1981 by Dr. Thomas Holtzen, an otolaryngologist, or ear, nose, and throat specialist.  Dr. Holtzen noted

that her complaints were mostly related to ear pain, nasal congestion, and glandular swelling. Her symptoms decreased if she rested and if she took the antibiotic Keflex. Dr. Holtzen found that Lindsay suffered from a deviated septum, which may have caused intermittent glandular swelling.

On April 7, 1981, Dr. Knapp, an allergy specialist, noted recurrent swelling of the glands in Lindsay's neck, headaches, ear discomfort, and nasal symptoms, including sneezing and congestion. Lindsay reported that her headaches occurred daily from May through July of the previous year, 1980. These headaches recurred for six week periods every two years from 1976 through 1984, when she had a hysterectomy. The headaches were associated with a runny nose and tearing eyes. She tested positive for certain allergies, her general examination was "unremarkable," no significant reactions were noted to common household allergens, and no lymphadenopathy was noted. Dr. Knapp concluded that her complaints were "non-specific."

Towards the end of the relevant period, from 1981 to 1983, Clyde Alley, M.D., another ear, nose, and throat specialist, treated Lindsay. In his initial medical history, Dr. Alley noted complaints of pain in her ears, intermittent swelling in the glands of her neck, and a blockage of her ears. Dr. Alley diagnosed Lindsay with a deviated septum and an x-ray showed that she had a

small air/fluid level and wall-membrane thickening in her sinuses. Lindsay returned to Dr. Alley on March 26, 1981, and Dr. Alley noted improvement. Dr. Alley prescribed Ergomar sublingual for Lindsay's headaches, although she did not have classic migraine symptoms. In 1983, Lindsay complained of headaches and exhibited "mucoid drainage."

Finally, on June 22, 1982 Lindsay complained to her Ob/Gyn, Dr. Baer, of lower back pain in conjunction with a headache, chills, rectal pressure, and pain during intercourse. Dr. Baer's impression was that Lindsay "still probably has endometriosis." The records indicate that the backaches were intermittent. The doctor notes that Lindsay is having "her backache again," and that the "backache has returned." Lindsay reported improvement after taking Danocrine for three months and, in April of 1983, Lindsay stated that these symptoms were "nothing she can't put up with." Although the Danocrine alleviated her symptoms, Lindsay stated that she did not wish to continue the treatment because it made her feel bad emotionally. Her next medical records are dated 1986.

## 2.    Period After 1982

From 1986 until the present, Lindsay has primarily been treated by neurologists, endocrinologists, and pain management specialists for her condition. The records from 1986 onward reflect an increasingly debilitating disorder that is

typified by severe muscle rigidity, cramping, and debilitating fatigue.  Although her records do not provide a consensus on the cause of her condition, the doctors are unanimous that her condition has left her completely disabled at present.

On October 21, 1986, Lindsay visited St. Mary's Health Center.  Lindsay complained of depression, nausea, increased appetite, and a burning sensation across the back of her neck and her shoulders.  A few months later, on February 2, 1988, Edward Eyerman, M.D. a neurologist, examined Lindsay.  Lindsay stated that she had experienced lower back pain for six years, that she could not sit for any length of time, and that she had pain primarily down her right leg, but with some left leg pain as well.  Lindsay had stopped exercising because it caused spasms in her back.  X-rays showed slight scoliosis and Dr. Eyerman believed that an EMG indicated she had a fifth lumbar radiculopathy with some involvement of the first sacral root.

From July 19, 1987 to July 9, 1988, Lindsay saw Dr. Rudee Suwannasri after she injured her back in a fall the previous June.  Dr. Suwannasri's examination revealed limited lower back movement with a tender paravertebral muscle.  Dr. Suwannasri found that a treatment of Prednisone and Diazepam resolved the problem.  On July 9, 1988, Lindsay had improved, but had difficulty walking because of an undetermined metabolic myopathy that prevented Lindsay

from relaxing her muscles after contraction. Steroid therapy decreased Lindsay's pain and stiffness and Valium made her muscles more flexible.

After these entries, there is approximately a ten-year gap in Lindsay's records. On January 8, 1997, Lindsay recounted a history of muscle tightness in her calves beginning in 1984, with progression to her back in 1986 and, by 1988, throughout her entire body, to Richard S. Sohn, M.D., a professor of neurology. A thyroid supplement had improved Lindsay's condition until 1991, when her muscles began to tighten up again. On February 20, 1997, after performing several tests on Lindsay, Dr. Sohn advised Lindsay that her primary problem was somatization disorder and suggested she see a psychiatrist.

On January 29, 1998, Lindsay described a ten year history of muscle stiffness to Alan Pestronk, M.D., another professor of neurology. Dr. Pestronk noted that Lindsay was "mainly a household ambulator," that she could not raise her arms to put a shirt over her head and could not do household work. On April 9, 1998, Dr. Pestronk recorded that Lindsay walked stiffly and hunched over, she could not "lift her arms against gravity," had diffuse pain, cramps, burning, and muscle weakness. On July 2, 1998, Lindsay was only able to walk twenty feet, had muscle pain, cramping, and weakness. Dr. Pestronk stated that this disorder was of unknown "etiology, despite numerous tests."

On December 3, 1999, Plaintiff was seen by Dr. Guy E. Van Goidsenhoven. Dr. Van Goidsenhoven noted that Lindsay spent most of her time lying on the sofa, was depressed, and had poor sleep habits. Lindsay had very stiff muscles with no obvious atrophy. The doctor's impression was muscle disease.

On August 1, 2000, an Assessment Report was prepared by Julie T. Hess of Autonomous Case Management of St. Louis. Ms. Hess noted that Lindsay was frail; spent most of the interview lying on the couch; walked very slowly in a bent over position; was pale and became paler when she stood; had hand tremors upon use; was unsteady when walking; was easily fatigued; and took many rest periods when talking. Lindsay's muscles cramped during activity. Lindsay did not drive and she rarely left home. In Ms. Hess' opinion Lindsay was barely able to carry out day-to-day activities.

On January 5, 2000, Dr. Dobmeyer examined Lindsay and noted severe stiffness, muscle weakness, and pain associated with movement. Dr. Dobmeyer found that Lindsay presented "with a most unusual picture with severe pain and stiffness particularly of the neck and shoulder area with definite evidence of myelopathy." During this visit, Dr. Dobmeyer noted that Lindsay was "healthy in her youth" did not seem to have "too much health problems" while she was married, and that Lindsay stated that she began to decline "primarily over the past

ten years."

MEDICAL OPINIONS

In 2006 and 2007, four physicians provided medical opinions on Lindsay's condition. Each opinion states that Lindsay's disability began prior to 1982. All of them base their opinions on their review of Lindsay's previous medical records. None of these doctors claim to have treated Lindsay during the relevant period.

In July of 2006, Gurpreet S. Padda, M.D. treated Lindsay a single time for pain, muscle cramping, and weakness. On December 18, 2006, Dr. Padda stated that a review of Lindsay's medical records showed that she was disabled before June of 1982 due to a complex medical condition.

Michael S. Boedefeld, M.D. saw Lindsay two times – once in 2005 and once in 2006. A year after these treatments, on January 22, 2007, Dr. Boedefeld stated that he considered Lindsay's condition rare, but consistent with a type of autonomic dysfunction. After reviewing her medical records, Dr. Boedefeld concluded that Lindsay was completely disabled before June of 1982.

Gregg E. Hellwig, M.D., does not state that he treated Lindsay. Dr. Hellwig reviewed Lindsay's medical records and, in a letter dated December 14, 2006, concluded that Lindsay suffers from a long-standing and severe disability. He stated that the documentation of recurrent symptoms completely disabled Lindsay

before June 1982.

Devon Golding, M.D. of National Medical Information Services, Inc., was Lindsay's internist from August 2003 to September 2006. Dr. Golding found Lindsay was severely limited, primarily due to chronic fatigue syndrome, fibromyalgia, an unidentified myopathy, and autonomic dysfunction. Dr. Golding stated that, based on a review of Lindsay's medical records, Lindsay's disability "rose to clinical significance in the late 1970s disabling her before June 1982 and has persisted continuously since, disabling her up into the present day." Lindsay did not submit Dr. Golding's opinion to the ALJ, but she did submit it to the Appeals Council.

LEGAL STANDARD

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or

because the court would have decided the case differently.  *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and consider:

(1)     the credibility findings made by the Administrative Law Judge;

(2)     the education, background, work history, and age of the claimant;

(3)     the medical evidence from treating and consulting physicians;

(4)     the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5)     any corroboration by third parties of the plaintiff's impairments; and

(6)     the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ., & Welfare*, 622 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in social security regulations as the "inability to engage in any gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. 404.1505(a); 20 C.F.R. 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, she is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, she is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, she is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the Plaintiff, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See e.g.*, *Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimants prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

*Id.* at 1322.

## DISCUSSION

Lindsay argues that substantial evidence does not support the ALJ's

decision and that the ALJ erred by failing to address the medical opinions of her treating physicians. Lindsay identifies Doctors Padda, Boedefeld, and Hellwig as treating physicians. While there is no doubt that Lindsay is disabled now, substantial evidence in the record supports the ALJ's determination that Lindsay was not disabled before 1982. Additionally the ALJ was justified in not addressing the opinions of Doctors Padda, Boedefeld, and Hellwig, as they are not treating physicians under the regulations.

### 1.    Substantial Evidence

The ALJ found that Lindsay was not credible and that her medical records before and after the relevant period do not establish a disability prior to 1982. Lindsay bears the burden of demonstrating that a medically determinable impairment lasting continuously for twelve months during the period from 1977 to 1982 prevented her from performing her past relevant work. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). "To support the award of disability benefits, a disease must have progressed from latency to a level constituting severe impairment as defined under Title II before the expiration of the insured period." *List v. Apfel*, 169 F.3d 1148, 1149 (8th Cir. 1999).

The ALJ considered Lindsay's claim by first addressing the records from the relevant period, then considering her records for the subsequent twenty years,

and finally by analyzing the credibility of Lindsay's current claims in light of the record as a whole. The ALJ found that Lindsay's illnesses prior to 1982 were intermittent and not debilitating. The record from this time primarily shows treatments for allergies and sinus infections. Lindsay does not claim that these are part of her disability. The record also reflects treatments for headaches, glandular swelling, and backaches, which only began a few months before Lindsay's status expired. Lindsay's doctors at the time explicitly characterized these illnesses as intermittent, and Lindsay stated that she could tolerate her backaches. Lindsay's doctors also found that her backaches could be controlled by medication, however, Lindsay chose not to pursue this treatment. In addition, the backaches did not appear until only a few months before Lindsay's status expired, and so could not have constituted a disability for twelve continuous months before the expiration of her status. While there are references to Lindsay's visiting a neurologist and a notation of fibromyalgia during this period, the record does not indicate any impairment that would have prevented Lindsay from functioning for twelve continuous months. Because there is no affirmative evidence of disability in her records prior to 1982, I find that substantial evidence supports the ALJ's determination that Lindsay's records from the relevant time period do not demonstrate a severe impairment.

Next, the ALJ found that Lindsay's later medical records also do not support her claim that she was disabled before 1982. Lindsay did not seek treatment of any kind between 1983 and 1986 and later did not seek treatment from 1988 to 1997. Lindsay and her doctors repeatedly stated that her condition began some time between 1984 and 1990 and that she did not become disabled until some time after that. In addition, many of Lindsay's doctors were not convinced that she was disabled even as late as 1998. Dr. Pestronk found no evidence of myotonia or myopathy in 1998 and in 1997, Dr. Sohn found "no evidence of anything wrong with brain, spinal cord, nerve or muscle" and suggested that Lindsay see a psychiatrist. As a result, I find that substantial evidence supports the ALJ's finding that Lindsay's disability did not "arise any earlier than 1988."

Finally, the ALJ found that Lindsay's current claims that she was disabled before 1982 are inconsistent with the record. An ALJ may properly "discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole." *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000). The ALJ found that if Lindsay were suffering from a debilitating muscle illness before 1982, she would have indicated as much to her doctors, that she would not have foregone all treatment from 1983 to 1986, and that she would not have discontinued her

medication for backaches simply because they made her feel bad emotionally and because they made her gain weight. There is substantial evidence to support the ALJ's determination that Lindsay's current claims are inconsistent with the record as a whole.

### 2. The 2006 - 2007 Medical Opinions

Lindsay claims error based on four medical opinions that the ALJ did not specifically address. First, Lindsay claims that these medical opinions demonstrate that she had a disability prior to 1982 and therefore negate the substantial evidence supporting the ALJ's decision. Second, Lindsay claims that it was reversible error as a matter of law for the ALJ to fail to address three of these opinions, as they were included in the record before the ALJ and were prepared by Lindsay's treating physicians. As explained below, because these documents do not supplement the record with any additional evidence from the relevant period, they do not diminish the substantial evidence supporting the ALJ's decision. In addition, the medical opinions were not prepared by "treating physicians" as defined by the regulations and the ALJ was not required to address the weight given to each doctor's opinion.

The medical opinions at issue were written in 2006 and 2007 by doctors Padda, Boedefeld, Golding and Hellwig. These doctors treated Lindsay

infrequently or not at all, with Dr. Boedefeld treating her most frequently at two times in two years. None of the doctors treated Lindsay before 2003. None of them have any knowledge of Lindsay's condition during the relevant period beyond what is written in the medical record, or even knowledge of Lindsay's condition within twenty years of the expiration of her status. Their opinions are entirely based on their review of Lindsay's medical records and do not provide any objective medical evidence "obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." *See* 20 C.F.R. § 404.1529. The opinion letters consist of a list of Lindsay's prior illnesses and current symptoms and a conclusion that Lindsay suffers from "some type of autonomic dysfunction." Each includes a conclusion that Lindsay was disabled prior to 1982. Effectively, these opinions assert that, because Lindsay has a rare and complex, yet unidentifiable, condition, every illness that she has ever had must be related to her current condition and therefore her ability to function prior to 1982 must have been so severely impaired that she is entitled to disability benefits for that period.

While these medical opinions could theoretically be correct, an ALJ need not grant a medical opinion controlling weight if it is inconsistent with the record

as a whole.  20 C.F.R. § 404.1527(b).  Here, these opinions, which state that Lindsay's disability began before 1982, are inconsistent with Lindsay's medical records, Lindsay's own statements as late as January of 2000, and all of Lindsay's treating physicians statements prior to 2005, all of which indicate that her condition did not begin to manifest itself until after 1984, at the earliest, and that Lindsay was not disabled until sometime in the mid to late 1990s.  In addition, while a doctor's medical opinion is entitled to consideration, a doctor's legal conclusion that a patient is, or was, "disabled" is entitled to no weight, as it is the Commissioner's responsibility to ultimately determine whether a person is disabled under the terms of the statute.  *See House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007).  Once the conclusions regarding Lindsay's disability are stripped from these opinions, there is little remaining aside from a summary of the medical record – a record the ALJ thoroughly reviewed – and a list of possible conditions that could cause her current disability.  This haphazard linking of symptoms and illnesses entirely disregards time and circumstance, is inconsistent with the record, and is not sufficient to negate the substantial evidence supporting the ALJ's decision.

Additionally, the relationships between Lindsay and doctors Padda, Boedefeld, and Hellwig demonstrate that they were not "treating physicians"

under the statute.  Generally, an ALJ must address the weight given to a treating

physician's opinion, even if the opinion is ultimately disregarded.  *See* 20 CFR §§

404.1512(e)(1), 416.912(e)(1).  However, not all doctors that examine or treat a

claimant are treating physicians under the regulations.  *See* 20 C.F.R. § 404.1502.

The regulations provide that a nontreating source is "a physician . . who has

examined [the claimant] but does not have, or did not have an ongoing treatment

relationship with you."  *Id.*  In addition, the ALJ has discretion to find whether a

physician is a treating source based in part on whether the physician treated the

claimant "only a few times or only after long intervals (e.g., twice a year)."  *Id.*

Since these doctors did not treat Lindsay within twenty years of the expiration of

the relevant period, they only treated her infrequently, and their opinions are not

based on their treatment of Lindsay, but on a review of her medical records, I find

that it was not error for the ALJ to fail to address them.  *See Morrison v. Apfel*,

146 F.3d 625, 328 (8th Cir. 1998) (stating that an ALJ is not required to discuss in

detail every item of evidence); *see also Miller v. Shalala*, 8 F.3d 611, 613 (8th Cir.

1993).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

AFFIRMED.

A separate judgment in accord with this Memorandum and Order is entered this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT COURT

Dated this 10th day of March, 2010.